## Mays *et al. versus* Dwight *et al.*

Dwight and Ashton leased a tract of oil land to Mays, with one well partly bored thereon ; Mays agreed to sink this well deeper, and to pay the lessors a royalty of one-fourth of the oil obtained from it.   It was the understanding of both parties to the lease, that this well was situated upon the tract leased ; it afterwards appeared that it was not within the lines of this lease, whereupon the lessees offered to deliver possession of the premises leased and refused to pay a royalty.   In a bill filed by the lessors for an account of profits, the court below ordered an account: *Held*, that it was a case of mutual mistake, against which equity will relieve, and that the bill should have been dismissed.

October 19th 1876.   Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.   WILLIAMS, J., absent.

Appeal from the Court of Common Pleas of *Venango county :* Of October and November Term 1875, No. 239.

This was a bill in equity, filed by E. P. Dwight and Samuel K. Ashton, trustees of the Keystone Oil Company, against Henry Mays, David Ochs, J. H. Smith, Abraham Smith and H. M. Davis, for an account of the value of oil alleged to have been produced by the defendants under a lease from the plaintiffs.   The answer admitted substantially the facts averred in the bill, but set up the defence which appears below.

The case was referred to a master, who reported substantially the following facts :  " On September 13th 1871 the plaintiffs made a lease for ten years, to Henry Mays, one of the defendants, of four acres of ground, part of a tract of land in Venango county, known as the ' Keystone property,' for oil purposes.   The leased property was described in writing as follows :  ' Beginning at the south-east corner of the Keystone tract, thence by land of Henry Sayers west 16 perches, thence north 40 perches, thence east 16 perches to the line of the Decatur Oil Company, thence 40 perches along that line south to the place of beginning, containing four acres, with one well thereon partly bored, together with the engine, boiler, rig and tools, also tubing, casing, sucker rods and other appliances necessary to be used in and about said well which may be on the said premises.   The said well to be cleaned out and sunk deeper to the third sand rock by the party of the second part.'

" Mays covenanted in said lease to keep accurate books of account,

[Mays v. Dwight.]

showing the daily product of each well on the lease and the division and delivery of the same, and to deliver to the plaintiffs one-fourth of the petroleum obtained from the land so leased, as often as once in every ten days, or oftener if required. About October 1st 1871 certain interests in this lease were purchased by the other defendants.

"In pursuance of the lease, Henry Mays and his assigns entered upon the leasehold and completed drilling the unfinished well thereon, specified in the lease, by sinking it about 160 feet deeper, and obtained from it 264 barrels of oil, worth and averaging on the premises $2.93 per barrel. The defendants ceased operating this well shortly after the bringing of this suit, but commenced again some time in the winter of 1872-3. The defendants have never rendered to the plaintiffs an account of the production of said well, and have not delivered to them any oil as royalty thereon.

"Prior to the signing of said lease by Henry Mays, he and the plaintiffs' agent had some negotiations between them about the lease and well. Both believed the well to be on the four acres described in the lease. The lease was prepared and sent by the plaintiffs to Mays, who signed it.

"The defendants then repaired the engine and other personal property leased, at a cost of about $100, which repairs were necessary to their use, and sunk the well to a third sand rock, at an additional expense of $500, finishing it in the latter part of December 1871.

"On September 9th 1871, Mays took a lease of ten acres of a tract of land adjoining the tract of plaintiffs, from H. J. Sayers, for oil and mining purposes (the other defendants becoming interested therein), at a rent of one-sixteenth of the oil. The two leases adjoined, and possession under both was taken the same day.

"After the defendants took possession and some time after they had been drilling at the old well, Sayers claimed that it was on the ten acres leased to Mays. Upon notice of this claim to the plaintiffs below, they caused a survey of the premises to be made, which showed that the old well was not upon the four acres leased by them to Mays. Since this survey the defendants had been paying the rent or royalty to Sayers, on his demand as their landlord. The defendants offered, after the bringing of this suit, to surrender possession to the plaintiffs of the premises mentioned in the lease of 13th September 1871, including the engine and other personal property therein mentioned, as also to give them possession of the well referred to therein, and to pay them a suitable rent therefor. The old well was situated within the lines of the Sayers lease of ten acres."

Upon these facts the master was of opinion that the plaintiffs could not recover for oil obtained from a well situated outside of the demised premises, and reported a decree dismissing the bill.

The court below (Trunkey, P. J.), upon exceptions to the mas-

ter's report, sent the case back to the master to state an account as prayed in the bill, which the master did, finding a balance due the plaintiffs of $361.76. This report was confirmed and a decree made in pursuance thereof, to which this appeal was taken by the defendants below.

*Kinnear* and *Smiley*, for appellants.

The appellees did not present a paper-book.

Mr. Justice PAXSON delivered the opinion of the court, October 30th 1876.

Perhaps no rule of law is better settled than that a tenant in possession under a lease shall not be allowed to dispute the title of his lessor. Yet this rule, like most others, has its exceptions. Where the tenant has been induced to accept the lease by misrepresentation, fraud or trick practised upon him by the lessor, he is not estopped from setting up a superior title to that of the lessor: Hamilton *v.* Marsden, 6 Binn. 45; Brown *v.* Dysinger, 1 Rawle 408; Baskin *v.* Seechrist, 6 Barr 154. It was said by Justice BELL in the last-named case, that " It matters not whether the deception practised originated in voluntary falsehood or in simple mistake, for the immunity it confers springs not so much from the fraud of the usurper as from the wrong which the deception would otherwise work upon the rights of the lessee." Here it is clear that both parties to the lease believed the well to be on the four acres described therein. The master so finds. We have then the case of a mutual mistake. It turns out that the well is upon the property of another person, who claims the rent or royalty for its use. The lessors have filed their bill in equity for an account of the oil taken from the well, the royalty for which they claim under the terms of the lease. The master finds the fact that the defendants (lessees) have offered, since the bringing of the suit, to surrender possession to the plaintiffs (lessors) of the demised premises. The court below made a decree in favor of the complainants, to which decree this appeal was taken.

We do not propose to indicate how far the matters alleged by the lessees would avail them as a defence in a proceeding at law to recover the rent under the lease. This is not such a proceeding. The lessors have invoked the aid of a court of equity. We think they have chosen the wrong tribunal. The rule that a tenant in possession cannot dispute his landlord's title is not more firmly established than is the familiar principle of equity that when a contract is made under a mistake, or in ignorance of a material fact, which is of the very essence of the contract, it is voidable and relievable in equity: Miles *v.* Stevens, 3 Barr 21; Gibson *v.* The Union Rolling Mill Co., 3 Watts 32; Horbach *v.* Gray, 8 Id. 492;

[Mays v. Dwight.]

Geiger v. Cook, 3 W. & S. 266; Jenks v. Fritz, 7 Id. 201. We have here a mutual mistake upon a matter that was of the very essence of the contract. It is in just such cases that equity relieves against the hard rules of the common law. But, as before observed, it is the lessors who are seeking the aid of equity to enforce their contract, notwithstanding the existence of this admitted mutual error affecting the life of the contract itself. They appeal to the conscience of a chancellor to make an unconscionable decree. For, if we make the decree prayed for, it would not protect the lessees from a suit from the owner of the well for the royalty, and they would be without remedy. It needs no argument to show that these complainants have no equity. We leave them to their remedy at law.

The decree is reversed and set aside, and the bill dismissed. The costs to be paid by the appellees.